**LUMEN VIEW TECHNOLOGY LLC, Plaintiff,**

v.

**FINDTHEBEST.COM, INC., Defendant.**

**No. 13 Civ. 3599(DLC).**

United States District Court, S.D. New York.

Nov. 22, 2013.

Damian Wasserbauer, Aeton Law Partners, LLP, Middletown, CT, for the plaintiff.

Joseph Leventhal Leventhal Law, LLP, San Diego, CA, for the defendant.

### OPINION & ORDER

DENISE COTE, District Judge:

On September 24, 2013, defendant Findthebest.com, Inc. ("Findthebest") moved for judgment on the pleadings in this patent infringement action pursuant to Fed.R.Civ.P. 12(c) on the ground that the patent on which plaintiff Lumen View Technology LLC ("Lumen View") predicates its claim for infringement is invalid for failure to claim patent-eligible subject matter. For the reasons that follow, the patent claims the abstract idea of computer assisted matchmaking and is invalid under 35 U.S.C. § 101 ("Section 101"). The defendant's motion for judgment on the pleadings is granted.

## BACKGROUND

Findthebest is a corporation that operates a website which matches users with goods or services according to criteria they enter. Lumen View is a company that owns patents and licenses them to other users for fees. On May 29, 2013, Lumen View brought suit against Findthebest on the ground that the matching process in Findthebest's website allegedly infringed a patent owned by Lumen View. That patent is United States Patent No. 8,069,073 ("'073 patent").

*The '073 patent*

The '073 patent is entitled "System and Method for Facilitating Bilateral and Multilateral Decision–Making." It is comprised of one independent claim and eight dependent claims. The application for the patent was filed in April 2010, and the patent was issued on November 29, 2011. The April 2010 application was a "continuation of application" for the invention claimed by this patent, and the initial application was made in 1999. The inventors of the '073 patent are listed as Eileen C. Shapiro and Steven J. Mintz. Listed as the assignee of the patent is a limited liability company called Dalton Sentry, LLC. Lumen View asserts that it is "the exclusive licensee of the '073 patent and possesses all rights of recovery under the '073 patent, including the right to sue and recover all damages for infringement thereof, including past infringement."

*The Independent Claim ("Claim 1") of the '073 patent*

The independent claim of the '073 patent ("Claim 1") states in full:

> We claim: A computer-implemented method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of at least one of (i) a financial transaction and (ii) operation of an enterprise, such context involving a first class of parties in a first role and a second class of counterparties in a second role, the method comprising:

In a first computer process, retrieving first preference data from a first digital storage medium, the first preference data including attribute levels derived from choices made by at least one of the parties in the first class;

In a second computer process, retrieving second preference data from a second digital storage medium, the second preference data including attribute levels derived from choices made by at least one of the counterparties in the second class;

In a third computer process, for a selected party, performing multilateral analyses of the selected party's preference data and the preference data of each of the counterparties, and computing a closeness-of-fit value based thereon; and

In a fourth computer process, using the computed closeness-of-fit values to derive and provide a list matching the selected party and at least one of the counterparties.

The "summary of the invention" provision of the patent elaborates that:

The method involves supplying to at least one of the parties a series of forced choice questions [1] so as to elicit party responses; supplying to at least one of the counterparties a series of forced choice questions so as to elicit counterparty responses; and delivering a list matching the at least one party and the at least one counterparty according to analysis of preference profiles determined using conjoint analysis of the party responses and the counterparty responses. In alternative embodiments the list may be ranked according to closeness of fit.

In summary, the purported invention disclosed by the '073 patent is a method of matchmaking whereby one or more parties on each side input attribute preferences and intensity of preference data and then a computer matches the parties on each side by a "closeness-of-fit" process and produces a list.

The patent also contains in its specification examples illustrating potential uses of the claimed process. One example is the matching of job applicants with employers based on both parties' preferred attributes in applicants and employers, respectively. The specification contemplates having each party disclose desired attributes, and intensity of preferences with respect to those attributes, and then having a computer match employees and employers whose desired attributes and intensities of preferences mutually align. Also listed as an exemplar use of the '073 patented method is the matching of "college applicants and ... colleges seeking applicants" by having each input preference data.

*The Dependent Claims of the '073 patent*

Claims 2 through 9 of the '073 patent are all dependent on Claim 1. They purport to add limitations to Claim 1's claimed process of computerized bilateral and multilateral decisionmaking. The claims are as follows: [2]

2. A method according to claim 1, wherein the list is ranked according to closeness of fit.

3. A method according to claim 1, further comprising receiving co-evaluator choices made by a party co-evaluator or a counterparty co-evaluator, wherein the list matches the at least one party and the at least one counterparty according to a multilateral analysis of

---

1. A forced choice question is a question with a closed set of possible responses.

2. The parties have not construed these dependent claims. All claim construction has focused on the terms in Claim 1.

preference data determined using such co-evaluator choices.

4. A method according to claim 1, wherein the party choices reveal, with respect to each level of each of a first series of attributes, a utility value which indicates the value that the party places on the level of the attribute.

5. A method according to claim 4, wherein the party choices reveal the utility values without the utility values being provided explicitly.

6. A method according to claim 4, wherein the counterparty choices reveal, with respect to each level of each of a second series of attributes that complements the first series of attributes, a utility value which indicates the value that the counterparty places on the level of the attribute.

7. A method according to claim 6, wherein the counterparty choices reveal the utility values without the utility values being provided explicitly.

8. A method according to claim 1, wherein at least one of the first preference data, second preference data, and the list is obtained from a remote server over a communication network.

9. A method according to claim 1, wherein the party choices and the counterparty choices are provided to a remote server over a communication network.

All of these method claims are expressly predicated on Claim 1.[3] Claim 2 (perhaps redundantly) claims the closeness of fit component of Claim 1's computerized bilateral and multilateral decision-making process claim. Claim 3 claims the process of

inclusion of a "co-evaluator's data in the multilateral analysis."[4] Claim 4 claims the process of attributing a utility value, indicating the value a party places on an attribute. Claim 5 permits the utility values to be created but not revealed to the participants. Claims 6 and 7 are identical to Claims 4 and 5 but are applied to a counterparty, rather than the initial party. Claims 8 and 9 allow the process claimed in Claim 1 to be provided to a remove server over a communication network-presumably the Internet.

*Procedural History*

On May 29, 2013, Lumen View filed suit against Findthebest for infringement of the '073 patent. In its complaint, Lumen View contends that Findthebest infringes on the '073 patent in

> [O]ffer[ing] recommendation services via the www.findthebest.com website ('Defendant Website') for individuals seeking the purchase of products and individuals offering to sell the products," by "execut[ing] a computer implemented method for facilitating evaluation, in connection with the procurement or delivery of products or services, in a context of the operation of an enterprise, such context involving a first class of parties (e.g., consumers) in a first role and a second class of counterparties in a second role (e.g., individuals selling goods).

On September 24, Findthebest moved for judgment on the pleadings on the ground that the '073 patent was invalid because it claimed an "abstract idea," which does not constitute patent eligible subject matter under Section 101 of the

---

**3.** Claims 5 and 6 are "method[s] according to [C]laim 4," and Claim 7 is a "method according to Claim 6." But since Claims 4 is a "method according to Claim 1," Claims 5, 6, and 7 are all ultimately predicated on Claim 1.

**4.** An example of such a co-evaluator given in the Specification is a guidance counselor, whose preference data might play a role in the matchmaking between a college and a college applicant.

codified Patent Act. 35 U.S.C. § 101. The motion was fully submitted on October 18.

DISCUSSION

■■■■ The standard governing a Section 101 challenge is well established. "Whether a claim is drawn to patent-eligible subject matter under § 101 is a threshold inquiry, and any claim of an application failing the requirements of § 101 must be rejected even if it meets all of the other legal requirements of patentability." *In re Bilski*, 545 F.3d 943, 950 (Fed.Cir.2008) (citation omitted) (hereinafter *"Bilski I"*). A patent is presumed to be valid by statute. *See* 35 U.S.C. § 282. The party challenging the validity of a patent bears the burden of proving invalidity by clear and convincing evidence. *See, e.g., Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir.2007). The question of whether a patent is invalid under Section 101 of the codified Patent Act is an "issue of law." *Bilski I*, 545 F.3d at 951.

### Section 101 of the Patent Act

Section 101 of the codified Patent Act defines the subject matter that is patentable:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

35 U.S.C. § 101 ("Section 101"). Section 101 lays out four subject matter categories of inventions or discoveries eligible for patent protection: processes, machines, manufactures, or compositions of matter. The '073 patent claims a "method for facilitating evaluation," which plainly is a process. Section 100(b) of the Patent Act provides that "[t]he term 'process' means process, art or method, and includes a new use of a known process, machine, manufacture,

composition of matter, or material." 35 U.S.C. § 100. The Supreme Court has elaborated on this statutory definition:

> A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.

*Diamond v. Diehr*, 450 U.S. 175, 183–84, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981).

Courts construe the Section 101 definitions broadly. "In choosing such expansive terms . . . modified by the comprehensive 'any,' Congress plainly contemplated that the patent laws would be given wide scope." *Diamond v. Chakrabarty*, 447 U.S. 303, 308, 100 S.Ct. 2204, 65 L.Ed.2d 144 (1980). The Supreme Court has recognized, however, "three specific exceptions to [Section 101's] broad patent-eligibility principles: laws of nature, physical phenomena, and abstract ideas." *Bilski v. Kappos*, 561 U.S. 593, 130 S.Ct. 3218, 3225, 177 L.Ed.2d 792 (2010) (citation omitted). The three exceptions "are consistent with the [statutory] notion that a patentable process must be 'new and useful' . . . [and] have defined the reach of the [patent] statute as a matter of statutory *stare decisis* going back 150 years." *Id.* These exceptions protect from monopolization concepts that constitute "part of the storehouse of knowledge of all men . . . free to all men

and reserved exclusively to none." *Funk Brothers Seed Co. v. Kalo Inoculant Co.,* 333 U.S. 127, 130, 68 S.Ct. 440, 92 L.Ed. 588 (1948). "Einstein could not patent his celebrated law that E = mc2; nor could Newton have patented the law of gravity." *Diehr,* 450 U.S. at 185, 101 S.Ct. 1048 (citation omitted).

### I. *Claim 1 of the '073 patent under Section 101*

 Findthebest contends that Claim 1 of the '073 patent is not drawn to patent eligible subject matter under Section 101 because the claimed process constitutes the abstract idea of matchmaking. "[A]bstract intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Gottschalk v. Benson,* 409 U.S. 63, 67, 93 S.Ct. 253, 34 L.Ed.2d 273 (1972). "A principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." *Le Roy v. Tatham,* 55 U.S. 156, 175, 14 How. 156, 14 L.Ed. 367 (1853).

Courts have had some difficulty defining with precision the line between an impermissibly abstract idea and a patentable process. But the Supreme Court in the 2010 case of *Bilski,* 130 S.Ct. 3218, provided lower courts with some guidance in drawing the line. Although declining to provide an authoritative definition of "process" for purposes of Section 101, the Court directed lower courts to look to, as "guideposts," its previous applications of the abstract idea exception in the cases of *Gottschalk v. Benson,* 409 U.S. 63, 93 S.Ct. 253, *Parker v. Flook,* 437 U.S. 584, 98 S.Ct. 2522, 57 L.Ed.2d 451 (1978), and *Diamond v. Diehr,* 450 U.S. 175, 101 S.Ct. 1048.

*Bilski,* 130 S.Ct. at 3231. The *Bilski* Court said that the Federal Circuit's "machine or transformation" test, set out in *Bilski I,* 545 F.3d at 958, should serve as "a useful and important clue" and "an investigative tool" for determining whether a patent claims patent eligible subject matter under Section 101, in conjunction with comparison of the above mentioned Court precedents, as part of a holistic analysis. *Bilski,* 130 S.Ct. at 3227. Accordingly, to resolve this motion it is necessary to conduct a holistic analysis of whether the '073 patent constitutes an abstract idea in light of the precedents of *Benson, Flook, Diehr,* and *Bilski* itself.[5] As part of this analysis, the "machine or transformation" test serves as a non-dispositive "investigative tool."

### A. *The Supreme Court's Abstract Idea Cases*

In the 1972 case of *Gottschalk v. Benson,* the Court invalidated a patent that claimed "a method of programming a general-purpose digital computer to convert signals from binary-coded decimal form into pure binary form." *Benson,* 409 U.S. at 65, 93 S.Ct. 253. The *Benson* Court held that the patent claimed not a patentable process, but an algorithm which constituted an abstract idea. The conceptual grounding of the court's holding was the impermissible breadth of the preemptive effect of patenting such a method. The Court noted that "the patent would wholly preempt the mathematical formula [undergirding the conversion of binary decimals to pure binary form] and in practical effect would be a patent on the algorithm itself." *Id.* at 72, 93 S.Ct. 253. The Court further emphasized the preemption concern in noting that the patent's " 'process' claim is so

---

**5.** *Bilski* directs a court to look to the facts and holdings of *Benson, Flook,* and *Diehr* as "guideposts" in determining whether a claimed process constitutes and impermissible abstract idea. It follows that *Bilski* itself should also be consulted in the same fashion.

abstract and sweeping as to cover both known and unknown uses ... vary[ing] from the operation of a train to verification of drivers' licenses to researching the law books for precedents." *Id.* at 68, 93 S.Ct. 253 (citation omitted).

In the 1978 case of *Parker v. Flook,* the Court invalidated a patent that claimed a new process for monitoring certain catalytic conditions during the oil refining process. The patent claimed a computer implemented method, which was undergirded by a mathematical formula by which monitors could be more easily alerted to dangerous developments during that process. Relying on its holding in *Benson* that a mathematical formula constituted an abstract idea that could not be patented, the Court framed the question in *Flook* as "whether the identification of a limited category of useful, though conventional, post-solution applications of such a formula makes [a patented] method eligible for patent protection." *Flook,* 437 U.S. at 585, 98 S.Ct. 2522. The Court answered in the negative. It held that post-solution application of an abstract idea to a particular field could not save a patent that fundamentally claimed an abstract idea. *Id.* Even though the patent at issue in *Flook* was more limited in its preemptive effect than that in *Benson* given that it claimed a process which was restricted to a particular industrial refining process unlike the binary decimal conversion method of general applicability in *Benson,* the Court found that the only contribution made by the patent's claimed invention was a mathematical algorithm, which constituted an abstract idea.

The *Flook* Court also made clear that computer implementation of the claimed process did not save it from invalidity due to abstractness. The Court invalidated that patent even though it, like the claim in *Benson,* was limited in being predomi-

nately tied to a computer in its application. Recognizing that "the abstract of disclosure makes it clear that the formula is primarily useful for computerized calculations," the Court nonetheless invalidated the patent's claims. *Id.* at 586, 98 S.Ct. 2522.

In the 1981 case of *Diamond v. Diehr,* the Court outlined the outer limits of the abstract idea in the course of upholding a patent that claimed a process for curing synthetic rubber. 450 U.S. at 184, 101 S.Ct. 1048. There, as in *Benson* and *Flook,* the challenged claim took the form of a mathematical formula. The Court distinguished the claim at issue, however, under the guiding principle that the preemptive effect of patenting the process in *Diehr* was more limited. The Court reasoned that, unlike the patent in *Flook*— which claimed a formula for computing an "alarm limit" which could be of general applicability—the process claimed in *Diehr* was of restricted applicability to the rubber curing industry. *Id.* at 186–87, 101 S.Ct. 1048.

The *Diehr* Court also made two observations about the abstract idea exception to Section 101 patentability. First, it stressed that "in a process claim ... a new combination of steps in a process may be patentable even though all the constituents of the combination were well known and in common use before the combination was made." *Id.* at 188, 101 S.Ct. 1048. Second, it emphasized that although *Benson* and *Flook* had invalidated process patents tied to computers, "a claim drawn to subject matter otherwise statutory [under Section 101] does not become nonstatutory simply because it uses a mathematical formula, computer program, or digital computer." *Id.* at 187, 101 S.Ct. 1048. Instead, in "determining the eligibility of [a] claimed process for patent protection under § 101, [any] claims must be considered

as a whole" to determine whether their applications to a particular context provides material of additional value beyond the abstract idea itself. *Id.* at 188, 101 S.Ct. 1048. The Court stressed, however, that this holistic analysis "cannot be circumvented by attempting to limit the use of the formula to a particular technological environment." *Id.* at 191, 101 S.Ct. 1048.

Most recently, the Supreme Court addressed the abstract idea exception in the 2010 case *Bilski v. Kappos.* In *Bilski,* the Court invalidated as an abstract idea a business method patent that claimed a general method for hedging risk in the energy commodities market. *Bilski,* 130 S.Ct. at 3223. The independent claim in the *Bilski* patent read as follows:

> (a) initiating a series of transactions between said commodity provider and consumers of said commodity wherein said consumers purchase said commodity at a fixed rate based upon historical averages, said fixed rate corresponding to a risk position of said consumers;
>
> (b) identifying market participants for said commodity having a counter-risk position to said consumers; and
>
> (c) initiating a series of transactions between said commodity provider and said market participants at a second fixed rate such that said series of market participant transactions balances the risk position of said series of consumer transactions.

*Id.* at 3223–24. Rejecting the Federal Circuit's application of the "machine or transformation" test as the exclusive test for determining Section 101 patentability, the Court relied on *Benson, Flook,* and *Diehr* to hold that the patent claimed an abstract idea and was invalid. The Court held that "[t]he concept of hedging . . . is an unpatentable abstract idea, just like the algorithms at issue in *Benson* and *Flook.*" *Id.* at 3231. The Court also grounded its rea-

soning in concern about preemption. It explained that "[a]llowing petitioners to patent risk hedging would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Id.* at 3231.

### B. *The Federal Circuit's Application of Bilski*

After *Bilski,* the Federal Circuit worked to provide further definition to *Bilski's* somewhat open-ended test for determining process patent eligibility under Section 101. In May 2013, the Federal Circuit attempted, unsuccessfully, to provide definitive guidance to lower courts adjudicating a claim of impermissible abstractiness in its opinion in *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 717 F.3d 1269 (Fed.Cir. 2013) (hereinafter *"Alice"*). The patent holder in *Alice* claimed a computerized method of hedging risk in a two-party deal by enlisting a mutually trusted third party to ensure that each party complies with its payment obligation during the period between the making of the deal and the actual closing. The patent holder had four patents. The first two were "method" patents—which "were directed to a method (i.e., process), while the claims of the [other two] Patents [were] directed to a [computerized] system or product" to implement that method. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.,* 768 F.Supp.2d 221, 223 (D.D.C.2011). The district court had held that both the method patents and the system patents claimed abstract ideas and were invalid under the "machine or transformation" test and the Supreme Court's precedents in *Benson, Flook, Diehr,* and *Bilski. Id.* The Federal Circuit issued a per-curium opinion, wherein a majority of the court affirmed the invalidation of the method patents on the ground that they claimed an abstract idea while dividing 5–5 on the question whether the system pat-

ents claimed patent eligible subject matter. *Alice*, 717 F.3d at 1273.

The Federal Circuit's reasoning fractured into five separate opinions. One judge noted that

Although a majority of the judges on the court agree that the method claims do not recite patent eligible subject matter, no majority of those judges agrees as to the legal rationale for that conclusion. Accordingly, though much is published today discussing the proper approach to the patent eligibility inquiry, nothing said today beyond our judgment has the weight of precedent.

*Alice*, 717 F.3d 1269, 1292 n. 1 (Fed.Cir. 2013). Three different tests emerge from the five opinions. First, Judge Lourie's opinion would ask a court to evaluate to what extent the claim avoids broad preemption by containing "additional substantive limitations that narrow, confine, or otherwise tie·down the claim so that, in practical terms, it does not cover the full abstract idea itself," *id.* at 1282, with particular reference to whether the claim contains an "inventive concept . . . a genuine human contribution to the claimed subject matter." *Id.* at 1283. Second, Chief Judge Rader proposed an inquiry less focused on preemption than Judge Laurie's, stating that "the relevant inquiry must be whether a claim includes *meaningful limitations* restricting it to an application, rather than merely an abstract idea." *Id.* at 1299 (emphasis added). "A claim may be premised on an abstract idea—the question for patent eligibility is whether the claim contains limitations that meaningfully tie that idea to a concrete reality or actual application of that idea." *Id.* at 1299–1300. Finally, Judge Newman, writing only for herself, would eschew the "abstractness" Section 101 inquiry altogether and hold that if a claim fell into the enumerated categories of "useful arts,"

that the inquiry should proceed to apply "the laws of novelty, utility, prior art, obviousness, description, enablement, and specificity . . . [obviating the] need for an all-purpose definition of 'abstractness' or 'preemption,' as heroically attempted." *Id.* at 1322.

While *Alice* did not produce controlling reasoning, its holding that the method claim patents were invalid has precedential weight and must be followed by lower courts to the extent that the facts regarding any patents challenged in those courts are similar. Moreover, while the *Alice* judges disagreed on the fundamental methodology to apply in adjudicating patent invalidation questions of this type and produced no binding method, guidance can be drawn from any reasoning to the extent that its interpretation of the Supreme Court's cases in this area is persuasive.

C. *Applying the Supreme Court's and Federal Circuit's precedents to the '073 patent*

■ Applying the principles of *Benson, Flook, Diehr,* and *Bilski,* along with what guidance can be wrought from *Alice,* it is evident that Claim 1 of the '073 patent claims an abstract idea and does not qualify as a "process" under Section 101. The '073 patent claims the idea of bilateral and multilateral matchmaking using a computer in the context of a financial transaction or an enterprise. It is preemptive in the broadest sense. And its only real limitation—the use of a computer—constitutes mere post-solution application of an abstract idea to a *common context.* The patent must be invalidated under any of the above described Supreme Court precedents as well as under either the Judge Laurie or the Judge Rader methodology in *Alice.*

### 1. *Preemption*

The first common thread in the above cases is concern that a patented process will preempt all applications of an abstract idea. Concern about broad preemption undergirds the Supreme Court's precedent of patent invalidation in *Benson, Flook,* and *Bilski* and the Federal Circuit's invalidation of the method claims in *Alice*. Applying that principle here, it is clear that the '073 patent cannot stand. Put simply, the patent preempts the use of a computer to facilitate matchmaking. Its preemptive breadth is enormous. "Allowing [a patent holder] to patent [a broad process] would pre-empt use of this approach in all fields, and would effectively grant a monopoly over an abstract idea." *Bilski,* 130 S.Ct. at 3231. Permitting Lumen View this level of preemption would be out of step with the balance the patent system has struck between promoting innovation and allowing the widespread use of new and productive inventions and discoveries.

The preemptive reach of Claim 1 of the '073 patent extends at least as far as that of the invalidated patent claims in any of the above described precedents. For example, in *Benson,* the Supreme Court lamented that the claimed process of converting binary decimals was "so abstract and sweeping as to cover both known and unknown uses ... vary[ing] from the operation of a train to verification of drivers' licenses to researching the law books for precedents." Here, as there, permitting the patenting of bilateral or multilateral matchmaking using a computer would also cover "known and unknown uses," varying from the matching of online daters to securities traders looking for trading partners. And while the invalidated *Flook* patent was at least limited to preempting the use of an alert system in the oil refining industry, Claim 1 of the '073 patent preempts the use of computer assisted matchmaking in the context of *any* transaction or enterprise. Unlike the process held patentable in *Diehr,* which was directed to a specific application (rubber curing), the '073 patent is a patent of general applicability. Even the invalidated *Bilski* patent which the Supreme Court admonishingly described as purporting "to patent both the concept of hedging risk and the application of that concept to energy markets," *Bilski,* 130 S.Ct. at 3229, at least specified a market where its preemptive effect would presumably be predominantly felt.

### 2. *Absence of meaningful limitations*

A second common thread in the above cases invalidating patent claims for abstractness is that the patents lacked sufficient limitations to direct the claim to a particular area. This well established notion is embodied in Judge Rader's proposed test in *Alice* that a claim must have "meaningful limitations restricting it to an application, rather than merely an abstract idea." *Alice,* 717 F.3d at 1299. The "meaningful limitations" inquiry is present in all of the above described Supreme Court cases, most saliently in *Diehr,* where the limitation of an algorithm to the oil processing field saved it from invalidation on the ground of abstractness. *Diehr,* 450 U.S. at 188, 101 S.Ct. 1048. Claim 1 of the '073 patent contains no meaningful limitation on conventional matchmaking at all. It is directed to financial transactions and the operation of enterprises. And as is described below, the application of matchmaking to a computer context is not a "meaningful" limitation that can save the Claim from invalidity.

### 3. *Lack of genuine human contribution to the subject matter*

The '073 patent would also fail Judge Laurie's proposed test in *Alice,* which requires an "inventive idea" constituting a

"genuine human contribution" to the subject matter, such that the claim moves outside of the realm of abstract ideas and into the category of particularized inventions. 717 F.3d at 1283. There is no inventive idea here. Having two or more parties input preference data is not inventive. Matchmakers have been doing this for millennia. Nor is an unspecified closeness of fit process an inventive idea. It is merely a mathematical manifestation of the underlying process behind matchmaking: determining good matches. Nothing in the '073 patent evinces an inventive idea beyond the idea of the patent holder to be the first to patent the computerization of a fundamental process that has occurred all through human history.

### 4. The role of a computer in the '073 patent does not render it patentable.

■ The abstract ideas exception to the Section 101 categories "cannot be circumvented by attempting to limit the use of the [idea] to a particular technological environment." *Diehr*, 450 U.S. at 191, 101 S.Ct. 1048. The fact that the '073 patent's matchmaking claim is implemented through a computer does not save it from invalidation. Indeed, *all* of the process patents invalidated in *Benson*, *Flook*, *Bilski*, and *Alice* were implemented by a computer. The Federal Circuit's most recent test for determining the relevance of a computer element of a claim in the Section 101 analysis is context specific. "To salvage an otherwise patent ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not." *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Canada (U.S.), L.L.C.,* 687 F.3d 1266, 1278 (Fed.Cir.2012); *accord SiRF Tech., Inc. v. Int'l Trade Comm'n,* 601 F.3d 1319, 1333 (Fed.Cir.2010) ("for the addition of a machine to impose a meaningful limit on the

scope of a claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly, i.e., through the utilization of a computer for performing calculations."). Claim 1 of the '073 patent recites the process of a computerized retrieval of preference data from two or more parties and the computation of a closeness of fit test to match parties. The steps in the Claim are: 1) retrieving the submitted preference data; 2) analyzing the data to compute a closeness of fit conclusion; and 3) providing a list. These processes can be performed by a human absent a computer. The computer element of the claim "function[s] solely as an obvious mechanism for permitting [matchmaking] to be achieved more quickly." *Id.*

A slightly different test for the relevance of the computer component to an otherwise abstract idea claim was set forth by Judge Rader in her opinion in *Alice*. Judge Rader posited that:

> The key to this inquiry is whether the claims tie the otherwise abstract idea to a specific way of doing something with a computer, or a specific computer for doing something; if so, they likely will be patent eligible, unlike claims directed to nothing more than the idea of doing that thing on a computer.

*Alice*, 717 F.3d at 1302. Under this test as well, the computer element of Claim 1 does not save the claim from invalidation. Neither Claim 1 nor the specification in the '073 patent discloses any special way of programming a computer to achieve the matchmaking function. In other words, the '073 patent does not disclose a specific *method* of using a computer to execute the abstract idea of matchmaking, it only claims the abstract concept of computerized matchmaking in a business or enterprise context.

### D. The Machine or Transformation Test

■ As part of the holistic analysis required by *Bilski*, the "machine or transformation" test serves as a useful nondispositive "investigative tool." *Bilski*, 130 S.Ct. at 3227. Under the "machine or transformation" test, "[a] claimed process is surely patent-eligible under § 101 if: (1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *Id.* at 3224 (citation omitted). Claim 1 of the '073 patent fails both prongs of the "machine or transformation" test and therefore its application confirms the conclusion, predicated on the above analysis of Supreme Court precedent, that it cannot stand.

### 1. Whether Claim 1 of the '073 patent is "tied to a particular machine or apparatus"

■ Claim 1 recites "[a] computer-implemented method for facilitating evaluation," wherein "digital storage medium[s]" are used to hold inputted preference data and a computer performs "multilateral analyses" of each party's preference data to compute a "closeness of fit value." This claim fails the machine prong of the machine or transformation test for two reasons. First, the matchmaking functions claimed do not require a computer to be performed. "[M]erely claiming a software implementation of a purely mental process that could otherwise be performed without the use of a computer does not satisfy the machine prong of the machine-or-transformation test." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed.Cir.2011). The core of the claimed process in Claim 1 of the '073 patent is the abstract idea of bilateral and multilateral matchmaking. Matchmaking by having parties declare prefer-ence data and deciding on good fits is a process as old as humanity itself. Adding a computer to the mix without showing how the computer adds significant value constitutes mere "post solution activity." *Flook*, 437 U.S. at 590, 98 S.Ct. 2522. And as *Bilski* makes clear, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment or adding insignificant post-solution activity." *Bilski*, 130 S.Ct. at 3230 (citation omitted).

■ The Federal Circuit addressed a similar claim in which a computerized process could be performed by a human alone in *CyberSource*, 654 F.3d at 1366. There, the claim at issue recited a method of detecting fraud in credit card transactions that were conducted over the Internet. The patent holder claimed that the patent was tied to a machine or apparatus because the claimed process required the Internet in order to be performed. *Id.* at 1370. The district court rejected that notion, and the Federal Circuit affirmed on the ground that the Internet was not required to perform the core function in the claim. The Federal Circuit noted that "while [the claim] describes a method of analyzing data regarding Internet credit card transactions, nothing in [the claim] requires an infringer to use the Internet to obtain that data." *CyberSource*, 654 F.3d at 1370. Similarly, here, the use of a computer to perform a process humans can perform independently is insufficient to fulfill the machine prong of the "machine or transformation" test.

Second, Claim 1 of the '073 patent fails the machine prong of the test because it is not tied to a "*particular* machine or apparatus*," as the test requires. Lumen View argues that the claimed process requires a "specifically programmed computer" such

that it satisfies the machine prong of the test. This contention is unavailing. Merely directing a computer to perform a function does not transform the computer into a specialized computer. Such a principle would lead to the absurd result of allowing the patenting the computerized use of even the most basic abstract ideas. Given the ubiquity of computers in modern life, adopting such a principle would have enormous preemptive effect. Nothing in Section 101 or the precedents interpreting it allow a party to monopolize the building blocks of innovation in a computerized world. Moreover, as noted above, all of the process patents invalidated in *Benson, Flook, Bilski*, and *Alice* were implemented by a computer. In none of those cases was there any intimation that the patents could be saved by virtue of the notion that the computers used were somehow "specialized" by virtue of performing the abstract processes at issue. Consequently, to the extent that the "machine" prong serves as an "investigative tool" it cuts against holding that the '073 patent claims Section 101 eligible subject matter.

2. *Whether Claim 1 of the '073 patent "transforms a particular article into a different state or thing"*

If a process is not tied to a particular machine then the "machine or transformation" test next asks whether the process produces a "transformation and reduction of an article to a different state or thing." *Benson*, 409 U.S. at 70, 93 S.Ct. 253. Lumen View argues that pulling preference data and creating a list derived from a closeness-of-fit analysis is transformative such that it fits this prong. This contention is unavailing.

The "transformation" prong originally contemplated physical transformation of a physical entity through a given process. By way of early example, in *Diehr*, the patent which the Court upheld under the transformation prong claimed a process that physically transformed raw, uncured rubber into molded, cured rubber products. *See Diehr*, 450 U.S. at 187, 101 S.Ct. 1048. Later, a doctrine emerged allowing the transformation test to apply to manipulations of non-physical data. The Federal Circuit explained that:

> The raw materials of many information-age processes ... are electronic signals and electronically-manipulated data ... [raising the question of] [w]hich, if any, of these processes qualify as a transformation or reduction of an article into a different state or thing constituting patent-eligible subject matter?

*Bilski I*, 545 F.3d at 962. The Federal Circuit drew a line in *Bilski I* in holding that the data manipulated must transform either a "physical object or substance, or an electronic signal representative of any physical object or substance." *Id.* at 964 Applying that test to the facts at issue in *Bilski I*, the Federal Circuit declared that a computerized risk hedging process which transformed "public or private legal obligations or relationships, [or] business risks" did not fulfill the transformation prong:

> Purported transformations or manipulations simply of public or private legal obligations or relationships, business, risks, or other such abstractions cannot meet the [transformation] test because they are not physical objects or substances, and they are not representative of physical *objects or substances.*

*Id.* at 963.

Here, the preferences that are manipulated in the claimed matchmaking process do not represent physical objects or substances. They are inapposite "abstractions" for purposes of the test. Consequently, the transformation prong of the

test also cuts in favor of invalidating the '073 patent.

## II. *The Dependent Claims of the '073 patent are also Invalid*

 The eight dependent claims of the '073 patent rely on Claim 1's claim of the computerized matchmaking process. The claims simply add broad, non-value added limitations to Claim 1's process of computerized matchmaking. They are invalid for two reasons. First, all of the dependent claims expressly depend on the invalid Claim 1. Claims 2, 3, 4, 8, and 9 are all disclosed as "method[s] according to claim 1." Claims 5 and 6 are disclosed as "method[s] according to claim 4" (which is dependent on the invalid Claim 1). And claim 7 is disclosed as a "method according to claim 6" (which is dependent on Claim 4, which in turn is dependent on the invalid Claim 1). Without Claim 1, the claims are no longer grounded in anything and are incoherent.

Second, none of the limitations materially limit Claim 1 such that they could survive independently even if Claim 1 were not invalidated. Claim 2 is simply the concept of adding a closeness of fit test to Claim 1. Claim 3 adds the abstract idea of using data from external co-evaluators in the process. Claims 4 and 6 claim the abstract idea of assigning a value to the preferences inputted. Claims 5 and 7 claim the equally abstract idea of not revealing that value to the parties in the matchmaking process. Finally, Claims 8 and 9 claim the quintessentially commonplace idea of using the internet. It is clear that none of these limitations create a process that can survive under the foregoing tests. None of them are tied to a particular machine nor do they transform anything. And they are all even more abstract than the processes invalidated in *Benson, Flook, Bilski,* and *Alice.*

The dependent claims of the '073 patent are analogous to the dependent claims invalidated by the Supreme Court in *Bilski* following the Court's invalidation of the underling independent claim there. *See Bilski,* 130 S.Ct. at 3231. After invalidating the independent claim of the process of risk hedging in the commodities context, the *Bilski* Court invalidated the dependent claims on the ground that the "remaining claims are broad examples of how hedging can be used in commodities and energy markets." *Id.* The Court explained that "[t]hese [dependent] claims attempt to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation." *Id.*

The dependent claims in the '073 patent add similarly little value to those invalidated in *Bilski.* Like the dependent claims in *Bilski,* the dependent claims here merely add to the unpatentable abstract idea of matchmaking the "well-known ... analysis technique[s]" of: incorporating "closeness of fit" analysis (Claim 2); adding data from external co-evaluators (Claim 3); assigning a value figure to the preference data inputted (Claims 4 and 6); hiding that value figure from participants (Claims 5 and 7); and using the Internet (Claims 8 and 9). Notably, although Findthebest devoted a section in its initial motion as to why Claims 2–9 were invalid, Lumen View failed to respond with any defense of those claims individually.

## III. *Lumen View's Arguments that the Motion is Procedurally Improper*

 Lumen View contends that a motion to invalidate a patent based on Section 101 is premature at the motion to dismiss stage for three reasons. First, Lumen View argues that the only relevant inquiry is whether it complied with the "Form

18"—an illustrative pleading form for patent cases in the Federal Rules of Civil Procedure. Second, Lumen View argues that the "clear and convincing" evidence standard for patent invalidation means that a patent usually should not be invalidated at the pleadings stage. And third, Lumen View somewhat contradictorily argues both that this motion should not be decided before claim construction has occurred and that the Court should adopt Lumen View's proffered claim construction in deciding this motion now.

Lumen View's Form 18 argument can be disposed of quickly. Lumen View confuses the fact that compliance with Form 18 may immunize a complaint from an attack on the *sufficiency of the details pled*[6] with the notion that compliance with Form 18 prevents a legally meritless claim from being dismissed on the pleadings. Lumen View relies on the Federal Circuit's statement in *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323 (Fed.Cir.2012), that "[a]s long as the complaint in question contains sufficient factual allegations to meet the requirements of Form 18, the complaint has sufficiently pled direct infringement." *Id.* at 1336. But the reason that compliance with Form 18 was sufficient to save those claims from dismissal at the pleading stage was that the patent-invalidation "arguments all focus[ed] on whether the amended complaints' allegations of direct infringement contain[ed] sufficient factual detail to withstand attack under *Twombly* and *Iqbal.*" *Id.* at 1335. In other words, compliance with Form 18 is usually sufficient to defeat an argument that a pleading is insufficiently detailed. But compliance with a pleading form cannot, of course, prove that a claim is legally meritorious.

Second, Lumen View argues that the "clear and convincing evidence" standard under which a patent invalidation motion must be adjudicated makes resolution of this motion improper at this procedural stage. But as Lumen View concedes, a motion to invalidate a patent on the pleadings is "not precluded, at this stage." It is true that "it will be rare that a patent infringement suit can be dismissed at the pleading stage for lack of patentable subject matter ... because every issued patent is presumed to have been issued properly, absent clear and convincing evidence to the contrary." *Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1338 (Fed.Cir. 2013). But rare does not mean never. Whether a patent is valid under Section 101 is a pure question of law. And when "the only plausible reading of the patent must be that there is clear and convincing evidence of ineligibility" the patent must be invalidated at the pleading stage. *Id.* As described in the foregoing, whether the '073 patent is addressed to Section 101 ineligible subject matter is not a close question. It is evident by clear and convincing evidence that the patent is invalid.

Finally, Lumen View objects to the fact that this motion was brought before claim construction has occurred. At the same time, Lumen View argues that "since the parties have already filed their statement of [claim construction] this Court should adopt Lumen View's proffered constructions in considering this motion." Findthebest urges that this motion be resolved absent any claim construction, and in the alternative it consents to use the construction of the claims submitted by Lumen View for purposes of this motion.

---

**6.** Under the pleading standards enunciated in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and

*Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

While claim construction may sometimes be helpful in resolving a Section 101 motion where detailed explication of the claims in a patent would reveal material legal issues, the Federal Circuit has said that "conducting a claim construction analysis before addressing § 101" is "not required." This is "because eligibility is a 'coarse' gauge of the suitability of broad subject matter categories for patent protection, . . . [and therefore] claim construction may not always be necessary for a § 101 analysis." *Id.* at 1339. In support of its holding that claim construction is not required prior to a Section 101 analysis, the Federal Circuit has "cited [*Bilski,* 130 S.Ct. at 3225], noting that the Supreme Court 'f[ound] subject matter ineligible for patent protection without claim construction.'" *Bancorp Servs.,* 687 F.3d at 1273.

 This motion turns on the question of whether one independent claim in the '073 patent claims a process that is impermissibly abstract. The claimed process elements of Claim 1 are straightforward. No components are opaque such that claim construction would be necessary to flush out its contours. "[T]he question of eligible subject matter must be determined on a claim-by-claim basis. Construing every asserted claim and then conducting a § 101 analysis may not be a wise use of judicial resources." *Ultramercial,* 722 F.3d at 1340. Here, the Section 101 inquiry encompasses only "broad subject matter categories" and claim construction is not necessary to reveal any material legal issues and would not be "a wise use of judicial resources."[7] *Id.*

CONCLUSION

Claim 1 of the '073 patent claims an abstract idea, which is patent ineligible

subject matter under Section 101 of the codified Patent Act. The dependent claims are invalid as well. Findthebest's September 24, 2013 motion for judgment on the pleadings is granted. The Clerk of Court shall enter judgment for the defendant and close the case.

---

**7.** In any event, having examined Lumen View's proposed claim construction, nothing contained in these submissions would alter the outcome of this motion. In fact, Lumen View urged in its claim construction brief that all of the claim terms which it sought to be construed by the Court be construed according to their "plain and ordinary meaning[s]."